UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LENETRA KELLAR,                                  Case No. 21-12133

     Plaintiff,                                 F. Kay Behm
v.                                               United States District Judge

THE YUNION, INC.,

     Defendant.
_____ /

**OPINION AND ORDER GRANTING MOTION
FOR SUMMARY JUDGMENT (ECF No. 15)**

## I.      PROCEDURAL HISTORY

Plaintiff brings this employment action against her former employer,

Defendant The Yunion.  (ECF No. 1).  She brings a claim under the Michigan

Whistleblowers' Protection Act (WPA), Mich. Comp. Laws § 15.361, *et seq.* (Count

I), a discrimination based on disability claim under the Americans With Disabilities

Act (ADA), 42 U.S.C. § 12101, *et seq*. (Count II) and the Michigan Persons with

Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws § 37.1201, *et seq.* (Count

III), retaliation claims under the ADA (Count IV), the PWDCRA (Count V), Title VII

(Count X), the Michigan Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws

§ 37.2101, *et seq.* (Count XI), failure to accommodate claims under the ADA

(Count VI) and the PWDCRA (Count VII), hostile work environment claims under

the ADA (Count VIII), the PWDCRA (Count IX), Title VII (Count XII), ELCRA (Count

XIII) and a wrongful discharge claim in violation of Michigan public policy (Count

XIV).  *Id*.  On April 3, 2023, Defendant, The Yunion, Inc., filed its motion for

summary judgment.  (ECF No. 15).  This matter is fully briefed.  (ECF Nos. 19, 20,

22).  The court held a hearing via videoconference on January 31, 2024.  (ECF No.

23).

For the reasons set forth below, the court **GRANTS** Defendant's motion for

summary judgment.

## II.   FACTUAL BACKGROUND

Kellar began her employment with Defendant as an independent

contractor in 2017.  (ECF No. 15-2, p. 16:15-17).  On November 26, 2018, she

became a full-time case manager in the Diversion program.  (ECF No. 15-3, pp.

39:15-25, 40:8-11).

In May 2019, there was a flood in the building where Defendant rented its

space.  (ECF No. 15-3, p. 54).  On June 18, 2019, Defendant emailed Kellar and

other staff regarding asbestos removal at the building where they were

employed, which was required as part of the flood remediation.  (ECF No. 20-4).

Jason Wilson, Defendant's CEO, responded to the email with pictures of holes and

tears in the tarp that had a sign on it that said "Danger Zone. Do Not Enter! This air is not safe to breathe!"  (ECF No. 20-5, Jason Wilson, June 18, 2019 email).

In June 2019, Kellar emailed Nicole Wilson, Defendant's Executive Director, and others with health concerns regarding the state of the building.  (ECF No. 20-7).  Bradley filed a Notice of Alleged Safety or Health Hazards with the State against the building that Defendant was operating out of regarding the fact that the restaurant in the building was serving food and other businesses' employees had to enter the areas that were labeled "DANGER ZONE" "Do Not Enter!"  (ECF No. 20-8, Notice of Health Hazards).  In August 2019, Defendant allowed Raynetta Bradley to work remotely due to her health concerns and the building environment.  (ECF No. 20-6, Bradley Declaration at ¶ 1).  Defendant later terminated Bradley for allegedly falsifying documents, but Defendant refused to tell her which documents.  (ECF No. 20-6, ¶¶ 1, 26).

In September 2019, MIOSHA sent Defendant a letter regarding allegedly hazardous working conditions.  (ECF No. 20-10).  Defendant responded and on December 3, 2019, MIOSHA indicated it was satisfied with the response.  *Id*.  On September 24, 2019, Kellar emailed Eric Reed, Defendant's Director of Operations, informing him that she would be working remotely after reviewing the reports on the condition of the building and that she would be going to the

3

doctor.  (ECF No. 20-11, September 24, 2019 Email).  The next day Kellar

requested to meet with Reed to discuss the feedback from her doctor.  (ECF No.

20-12, September 25, 2019 Email).  On October 1, 2019 Kellar provided Defendant

with a doctor's note, and two days later, a response was emailed stating

Defendant was taking additional steps to ensure that the building was and would

remain safe.  (ECF No. 20-13, October 3, 2019 Email).

Reed emailed Kellar on October 2, 2019, requesting that she meet him at

the Detroit Institute of Arts (DIA) commons area to conduct her performance

review.  (ECF No. 20-14, October 2, 2019 Email from Eric Reed).  That same day,

Kellar received a performance review in which she received at least four out of

five stars in 11 of 12 categories.  (ECF No. 20-15, October 3, 2019 Performance

Review).  On October 10, 2019, Kellar e-mailed Nicole Wilson's executive assistant

requesting an update to her expected reimbursement for work mileage.  (ECF No.

20-16, October 10, 2019 Email).

A month after Kellar's email requesting accommodations, Nicole Wilson

sent a follow-up email noting her symptoms and indicating that she required

another doctor's note to receive PTO.  (ECF No. 20-17, October 14, 2019 Email

from N. Wilson).  Kellar responded to the email, explaining that she was

experiencing re-occurring symptoms, which she felt were related to the condition

of the property and which had led to the need for medical treatment.  (ECF No. 20-18, October 14, 2019 email from Kellar).  Also on October 14, 2019, Nicole Wilson requested that Kellar return to the doctor and retrieve additional documentation that would allow her to take PTO and that another staff member would need to be hired to perform duties that must be performed on site.  (ECF No. 15-7, PageID.456, October 14, 2019 Email from N. Wilson).

The following day, on October 15, 2019, Kellar sent Defendant a letter from her doctor noting her medical conditions and requesting an alternative site for employment.  (ECF No. 20-20, October 15, 2019 Email).  The same day, Defendant e-mailed all staff informing them of a mandatory work meeting that would be held on October 16, 2019.  *Id*.  Kellar requested accommodations to attend this meeting remotely; however, this request was denied so Kellar was unable to attend.  *Id*.  In a follow-up e-mail, Defendant responded to Kellar that it would provide her access to safety reports in a meeting with her supervisor.  (ECF No. 20-21, October 21, 2019 Email) (ECF No. 15-6).  However, when Kellar met to review the records, they did not assuage her concerns regarding the fitness of the workplace.  (ECF No. 20-22, Kellar's Declaration at ¶ 1).

As a result, on October 21, 2019, Kellar reached out to Defendant suggesting alternative accommodations so that she would not be forced to work

in the building that her and her doctor believed was causing her health to deteriorate. (ECF No. 20-23, October 21, 2019 Follow-up Email). Reed replied that the interns would offer some support to case managers, but in a limited capacity. (ECF No. 20-24, October 21, 2019 Follow-up Email). The email also requested that Kellar meet with Reed at the DIA to review the updated building reports, even though Nicole Wilson told Kellar on October 14, 2019 that these were legal documents that could not be taken off the premises and Kellar could come into the building to review them. (ECF No. 20-25, October 21, 2019 from Reed). Reed forwarded the email to Nicole Wilson and Mr. Wilson with a "shrugging shoulder" emoji, to which Nicole Wilson replied: "So, she is making up the work tasks for the interns? Smh. Hopefully this can be resolved today." *Id*. A few hours later Nicole Wilson texted Kellar asking for the phone number of Kellar's sister, Phyllis Jackson, to invite her to an event; Nicole Wilson then mistakenly sent Kellar another text stating: "Hope her sister will still be on our board after I fire her." (ECF No. 20-43, Text Message).[1] Wilson testified that she was referring to Kellar in the text, which was meant for Reed. (ECF No. 20-3, Corporate Witness Deposition at 192:8-12).

---

[1] Plaintiff's other sister, Jaunice Kellar, is a board member of Defendant. (ECF No. 20-27, Yunion Website).

Ms. Wilson testified that she was contemplating firing Kellar because she had informed her via email on October 10, 2019 that she expected her to return to the office and Defendant had exhausted all potential investigations to prove that the work environment was safe.  (ECF No. 20-3, p. 192).  Wilson was not aware that Kellar was taking time off and she believed Kellar not coming into the office was a "no-call, no show."  (ECF No. 20-3, p. 193).  On October 14, 2019, Nicole Wilson emailed Kellar telling her she needed to assume her regular work schedule in office starting that day unless there was a specific letter from her doctor stating that she cannot work in the building.  (ECF No. 15-7, PageID.455, October 14, 2019 Email).  Ms. Wilson further explained that working remotely only allowed for Kellar to complete an average of 50% of her work duties and eliminated the client file management responsibilities.  *Id*.; see also ECF No. 15-3, pp. 107-108.  The following day, Kellar submitted a doctor's note for PTO, as instructed.  (ECF No. 20-28, October 15, 2019 Email; ECF No. 15-7, PageID.461, Doctor's Note dated 10/15/19).

When reviewing records in a meeting with Reed on October 21, 2019, Kellar became aware of the MIOSHA complaint against Defendant, and that there was mold in the building in which Defendant was attempting have Plaintiff work.  (ECF No. 20-29, Oct 21, 2019 Email).  Kellar emailed Jason Wilson, Nicole Wilson, and

Reed addressing the MIOSHA investigation and mold finding, as well as following

up on requesting documentation that quelled her health concerns.  *Id*.  The next

day, Nicole Wilson informed Kellar in an email that more detailed information

about the mold remediation process would be provided and that Kellar's

accommodation would be to work part time remotely, given that she was unable

to perform the onsite duties required:

> Hello Lanetra. We will provide you with a more detailed
> information of the mold remediation process from the
> environmental agency. In the meantime, in order to
> accommodate you, starting today, you will be able to
> work remotely on a part time basis. Again, this takes into
> consideration that nearly half of your work duties entails
> client file management, which cannot be done offsite.
> We will move forward with hiring an additional staff
> person to take over these duties in your absence from
> the office. This will be immediate in that we are now
> preparing for our case management client file audit,
> which you have been unable to assist with since working
> remotely. Once we receive the additional information
> that shows more specifically what the remediation
> process was, it is expected that you will return to your
> regular work duties in true office immediately. Because
> the air quality lab reports indicated that their [sic] was
> no threat to the building pre and post work to rectify
> issues from the flood, our position is that the building
> has been and is currently safe for all occupants. All
> assumptions that there are air contaminants in the
> HVAC are not valid for us. We are determining the air
> quality safe based on reports provided by credential
> environmental inspection reports that have been
> reviewed by our legal counsel and by an outside
> environmental inspector that our legal counsel hired to

> review the reports. If upon returning you are more
> comfortable working upstairs you will be able to work in
> the first floor office with Eric and myself.
>
> We are making these temporary accommodations out of
> consideration for the concerns you have about your
> health and well being.
>
> Again, starting today, your accommodations will be to
> work remotely on a part time schedule. Maximum 25
> hours per week. You will need to submit a time sheet to
> me on this coming Friday as I will need to process your
> time manually for next week's payroll. This is contingent
> on the additional detailed report not being returned this
> week. Again, once the report is returned that details
> more specifically the mold remediation process, it is
> expected that you will return to your normal work
> schedule or it will unfortunately be considered a no call
> no show.
>
> We are hoping that this will be resolved for you soon
> LaNetra. We truly appreciate the work that you do as a
> Case Manager for The Yunion. You are excellent at your
> job. We hope we can continue our work together as a
> ministry and as a family and put all of this behind us.

(ECF No. 20-30, October 22, 2019 Email).  Thereafter, Plaintiff submitted an intake

questionnaire with the Michigan Department of Civil Rights ("MDCR") alleging

that she was being discriminated and retaliated against in the workplace based on

a disability and for retaliation; this complaint was simultaneously sent to the U.S.

Equal Employment Opportunity Commission ("EEOC").  (ECF No. 20-22, Plaintiff's

Declaration at ¶ 4).   On November 15, 2019, Kellar filed a complaint with the

9

Michigan Occupational Health Safety Administration (MIOSHA) alleging

Defendant reduced her work hours in October 2019 in retaliation for her emailed

complaints in July 2019.  (ECF No. 15-10).  According to Defendant, the MIOSHA

complaint was withdrawn by Kellar in January of 2020.

On April 15, 2020, Kellar submitted to Reed the requested mileage

reimbursement forms.  (ECF No. 20-22, Plaintiff's Declaration at ¶ 5).  On June 25,

2020, Nicole Wilson e-mailed Kellar denying her reimbursement for work mileage,

despite the mileage being previously approved by Reed.  (ECF No. 20-31, June 25,

2020 Email).  On July 7, 2020, Kellar filed a complaint with the Michigan

Department of Labor ("DOL") because of Defendant's violations of labor law in

that: (1) Defendant was not reimbursing her for her mileage; and (2) Defendant

was not providing Plaintiff with paystubs.  (ECF No. 20-32, DOL July 7, 2020

Complaint).   Defendant responded to this complaint, explaining that Kellar

misunderstood the mileage reimbursement policy and therefore was not entitled

to reimbursement.  (ECF No. 15-8).  Specifically, Defendant's mileage

reimbursement policy indicates that mileage is reimbursable if an employee

travels to a worksite that is fifteen miles or more from Defendant's headquarters.

Kellar misinterpreted this policy to mean that mileage was reimbursed based on

round trip mileage.  No other staff member has ever been reimbursed based on

round trip, therefore Defendant denied Kellar's request for reimbursement.  *Id.*

This information was provided to the Department of Labor and the complaint was

subsequently withdrawn by Kellar on July 29, 2020.  (ECF No. 15-8, PageID.512).

On September 20, 2020, Kellar filed another complaint with the DOL

because Defendant was not providing her with paystubs.  (ECF No. 20-33,

September 30 Letter from DOL).  On October 21, 2020, the DOL investigator

emailed Reed and Mr. Wilson, informing them that it was a violation to not

provide pay stubs at the time of compensation.  (ECF No. 20-34, October 21, 2020

Email from DOL).  After receiving the complaint, Defendant immediately provided

the paystubs and even contacted their payroll company and enrolled in an

electronic system so that employees can access the paystubs electronically.  (ECF

No. 15-9).  This complaint was dismissed by the Department of Labor on

November 12, 2020.  *Id*. at PageID.521.

Historically, Defendant staffed its Diversion program with independent

contractors.  (ECF No. 15-3, p. 39).  In 2018, Defendant developed a new program

model with the Detroit Public School system.  *Id*.  For the first time, case

managers could go inside of the school systems and work in the schools two to

three days a week.  *Id*. at 39-40.  This allowed Defendant to fund two full-time

case managers.  *Id*. at 39.  In 2018 and 2019, Defendant received 68% percent of

its budgeted revenues under the Wayne County contract, but during the second quarter of 2020, Defendant only received 47% of its budgeted revenues, creating an unprecedented 53% shortfall in funding for the Diversion program.  (ECF No. 15-3, pp. 28-29).  The shortfall was due to the case managers inability to see clients due to the closing of the schools and, at the time, there was no indication of when the schools would reopen and when revenues would level out.  *Id*. at pp. 28-29; ECF No. 15-4, p. 106:13-25.  With the steep decline in revenues, Defendant decided to eliminate the full-time case manager role in the Diversion program and revert it to an independent contractor position like the rest of the staff in the Diversion program.  (ECF No. 15-3, p. 28; ECF No. 15-4, p. 106).  Defendant could not guarantee a certain number of hours for its independent contractors at that time, so as an alternative, it was prepared to offer a severance equal to three-months' salary to help Kellar bridge the gap between employment.  Both options were presented to Kellar, she declined both, effectively ending her employer-employee relationship with Defendant.  (ECF No. 15-3, pp. 146:21-147:10; ECF No. 15-4, p. 101:7-11); (ECF No. 20-35, October 22, 2020 Letter); (ECF No. 20-36, October 27, 2020 Email); (ECF No. 20-35; ECF No. 20-37, October 27, 2020 Severance Agreement).

Defendant alleged that because of budgetary issues, the funding of the full-time position would have to end; however, according to Kellar the same budgetary issues had been present since 2018, and the stated reason was pretextual.  (ECF No. 20-22, Plaintiff's Declaration at ¶ 6).  Kellar also points out that Defendant had just received $129,600 in Paycheck Protection Program (PPP) loan as of October 19, 2020 for 11 employees.  (ECF No. 20-38, PPP Loan 2020; ECF No. 15-3, p. 32; 10-11).

On November 4th or 5th of 2020, Kellar's performance review was significantly lower than the previous year, although this performance review is not in the record, and when Kellar requested an explanation, Kellar says that Defendant could not provide her with any factual support for the alleged decrease in performance.  (ECF No. 20-22, Plaintiff's Declaration ¶ 7).  On November 6, 2020, Kellar worked her last day for Defendant. (ECF No. 20-39, November 3, 2020 Email).

## III.    ANALYSIS

### A.    Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party

asserting that a fact cannot be or is genuinely disputed must support the

assertion by: (A) citing to particular parts of materials in the record . . .; or (B)

showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact."  Fed. R. Civ. P. 56(c)(1).  The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that

one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v.*

*McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251–52 (1986)).  Furthermore, the evidence and all reasonable

inferences must be construed in the light most favorable to the non-moving

party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986).

Where the movant establishes the lack of a genuine issue of material fact,

the burden of demonstrating the existence of such an issue then shifts to the non-

moving party to come forward with "specific facts showing that there is a genuine

issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  That is, the

party opposing a motion for summary judgment must make an affirmative

showing with proper evidence and to do so must "designate specific facts in

affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). To fulfill this burden, the non-moving party only needs to demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252–53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case for which it carries the burden of proof, the movant is entitled

to summary judgment.  *Celotex*, 477 U.S. at 323.  The court must construe Rule 56

with due regard not only for the rights of those "asserting claims and defenses

that are adequately based in fact to have those claims and defenses tried to a

jury," but also for the rights of those "opposing such claims and defenses to

demonstrate in the manner provided by the Rule, prior to trial, that the claims

and defenses have no factual basis."  *Id*. at 327.

    B.    <u>Title VII and Elliott-Larsen Claims (Counts X, XI, XII, XIII)</u>

       Kellar's complaint purports bring to retaliation and hostile work

environment claims under Title VII and the ELCRA.  However, disability-based

discrimination claims cannot be brought under Title VII.  *Clark v. City of Dublin,*

*Ohio*, 178 F. App'x 522, 524 (6th Cir. 2006).  Similarly, ELCRA only provides

protection from discrimination based on religion, race, color, national origin, age,

sex, height, weight, familial status, or marital status.  Mich. Comp. Laws

§ 37.2102(1).  Kellar states in her response brief that she is part of a protected

class because she is an "African American woman with a disability."  (ECF No. 19,

PageID.562).  However, nothing in her complaint suggests that she is bringing any

race or gender-based discrimination, retaliation, or hostile work environment

claims.  And her response does not offer any evidence pertaining to any race or

gender-based claims.  Accordingly, all Title VII and ECLRA claims must be dismissed.

     C.    <u>Hostile Work Environment Claims (Count VIII, Count IX)</u>

The PWDCRA creates a cause of action for a hostile work environment based on disability harassment and borrows federal law to analyze a claim. *Smoyer v. Dep't of Corr*., 2001 WL 1512064 *6 (Mich. App. Nov. 27, 2001).  In order to maintain an action for a hostile work environment under the ADA, the employee must demonstrate that: (1) she was disabled; (2) she was subject to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment unreasonably interfered with her work performance; and (5) the defendant either knew or should have known about the harassment and failed to take corrective measures.  *Trepka v. Bd. of Educ*., 28 F. App'x 455, 461 (6th Cir. 2002); *see also Plautz v. Potter*, 156 F. App'x 812, 818 (6th Cir. 2005).   A court must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance.  *Burnett v. Tyco Corp*., 203 F.3d 980, 982 (6th Cir. 2000).  To be actionable, however, "the conduct must be 'severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive.'"  *Warf v. U.S. Dep't of Veterans Affairs*, 713

F.3d 874, 878 (6th Cir. 2013) (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000)).  "[O]ffhand comments" and "isolated incidents" do not suffice.  *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Defendant argues that Kellar cannot satisfy the high burden of establishing that she was subjected to severe or pervasive harassment based on her disability. In her response, Kellar outlines the following actions she claims contributed to a hostile work environment based on her disability:  (1) she was denied mileage reimbursement; (2) she did not receive paystubs; (3) her hours were cut and she was no longer eligible to participate in the company benefit program (ECF No. 20-35); (4) the text from Nicole Wilson (ECF No. 20-43); (5) the October 21, 2020 email (ECF No. 20-25).[2]

In the court's view, the alleged harassment outlined by Kellar was not sufficiently severe or pervasive.  And Kellar's belief that these incidents of purported harassment were because of her disability does not create an issue of fact.  While it may satisfy the subjective prong of the hostile work environment test, it does not create a material issue of fact because she must also satisfy the

---

[2] Nothing in the record suggests that Kellar saw this email before it was produced in discovery, given that she was not copied on it.

objective prong of that test, which requires an environment sufficiently severe or pervasive to create the type of environment that a reasonable person would find it to be hostile or abusive.  "While there is no magic number of incidents that must occur within a certain period, when comparing the conduct about which [Plaintiff] complains to the conduct alleged in cases within this Circuit where a hostile work environment was found to exist, [Plaintiff's] claim does not favorably compare."  *Hunter v. Gen. Motors LLC*, 2019 WL 1436847, at *10 (E.D. Mich. Mar. 31, 2019), aff'd, 807 F. App'x 540 (6th Cir. 2020) (citing *Clay v. United Parcel Serv.*, *Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (The Sixth Circuit concluded that 15 incidents over a two-year period was not sufficiently pervasive.).

Importantly, the Sixth Circuit distinguishes between harassment and *discriminatory* harassment.  *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (citing *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 464 (6th Cir. 2000)).  An employee must demonstrate that the allegedly harassing conduct was motivated by a bias towards the employee's protected class.  *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).  Kellar does not offer evidence suggesting that the purportedly harassing conduct was motivated by her disability.  Accordingly, Kellar has not proffered sufficient evidence from which a jury could reasonably conclude that she was subjected to a pervasive hostile work

environment on basis of her disability.  Thus, summary judgment in favor of

Defendant on Kellar's hostile work environment claims is warranted.

     D.    <u>Disability Discrimination/Failure to Accommodate (Counts II, III, VI)</u>

To establish a prima facie case of disability discrimination under the ADA,

an employee must demonstrate that (1) she has a disability, (2) she is otherwise

qualified for the job "with or without reasonable accommodation," (3) she

"suffered an adverse employment decision," (4) her employer "knew or had

reason to know" of her disability, and (5) her position remained open, or she was

replaced.  *Hrdlicka v. Gen. Motors, LLC*, 63 F.4th 555, 566–67 (6th Cir. 2023)

(quoting *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)

(citation omitted)).  The Michigan PWDCRA similarly "substantially mirrors" the

ADA, and these claims are "generally analyzed identically."  *Hrdlicka*, 63 F.4th at

566 (citations omitted); *see also Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir.

2012).  To be "otherwise qualified" for a job, an employee must be able to

perform the essential functions of that job.  *King v. Mrs. Grissom's Salads, Inc.*,

187 F.3d 636 (6th Cir. 1999) (citing 42 U.S.C. § 12111(8)).  A prima facie case of

disability discrimination under the PWDCRA is established where (1) the plaintiff

is "disabled" as defined in the statute, (2) the disability is unrelated to the

plaintiff's ability to perform the duties of a particular job or position or is

unrelated to the plaintiff's qualifications for employment or promotion, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute. *Lowe v. City of Portage*, 2003 WL 33017804 (Mich. App. 2003) (citing Mich. Comp. Laws § 37.1202(1); *Petzold v. Borman's, Inc.*, 241 Mich. App. 707, 714 (2000)).

In the Sixth Circuit, in order to establish a prima facie case for failure to provide a reasonable accommodation, a plaintiff must show that: (1) she was disabled; (2) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004), overruled on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) (citing *Gaines v. Runyon*, 107 F.3d 1171, 1175B76 (6th Cir. 1997)); *see also Myers v. Cuyahoga Cnty., Ohio*, 182 F. App'x 510, 515 (6th Cir. 2006). To be "otherwise qualified" for the job, the employee bears the burden of showing she can perform the "essential functions" of the job, with or without accommodation. 42 U.S.C. § 12111(8). A prima facie case of discrimination under the PWDCRA requires a plaintiff to show that her disability is unrelated to her ability to perform her duties. *Steckloff v. Wayne State Univ.*,

2020 WL 3428966, at *6 (E.D. Mich. June 23, 2020).  Under the PWDCRA, the

phrase "unrelated to the individual's ability" means that "with or without

accommodation, an individual's disability does not prevent the individual from

performing the duties of a particular job or position."  Mich. Comp. Laws

§ 37.1103(1).  The phrase "with or without accommodation" guarantees that an

individual otherwise qualified for a particular job or position is entitled to some

accommodation if needed.  *Cunningham v. USF Holland, Inc.*, 2013 WL 1748563,

at *5 (Mich. Ct. App. Apr. 23, 2013).  However, the PWDCRA does not require an

employer to modify primary duties as an accommodation, nor is an employer

required to transfer an employee to another position.  Mich. Comp. Laws

§ 37.1210(15); *Rourk v. Oakwood Hosp Corp*, 458 Mich. 25, 31 (1998).  As

explained in *Rourk*, the PWDCRA specifically identifies the following types of

accommodation: "(1) purchasing equipment and devices, (2) reasonable routine

maintenance or repair of such equipment and devices, (3) hiring readers and

interpreters, and (4) restructuring jobs and altering schedules for minor and

infrequent duties."  *Rourk* recognized this was not an "exhaustive list" of

accommodations but provided guidance as to the types of accommodations the

Legislature contemplated.  *Id*. at 33.

1. *Prima Facie Case*

For both a discrimination claim and a failure-to-accommodate claim under the ADA and the PWDCRA, a successful plaintiff must be able to perform the essential functions of the job.  Essential functions generally are those that the employer's "judgment" and "written [job] description" prior to litigation deem essential.  *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (quoting 42 U.S.C. § 12111(8)).  A job function may be considered essential because (1) the position exists to perform the function, (2) a limited number of employees are available that can perform it, or (3) it is highly specialized.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (citing 29 C.F.R. § 1630.2(n)(2)).  The initial burden is on the individual with the disability to propose an accommodation and to show that it is objectively reasonable.  *Tubbs v. Formica Corp.*, 107 F. App'x 485, 488 (6th Cir. 2004) (The employee also bears the burden of proposing reasonable accommodations.).

According to Defendant, an essential function of Kellar's job as a case manager was to update and maintain her case files onsite.  (ECF No. 15-11, Case Manager Job Description) (General Case Management Duties include "Complete and turn in case notes in a timely manner"; Assessment duties include "Complete required assessment paperwork in an accurate and timely manner; Coordination

of Services duties include "Complete required paperwork in an accurate and

timely manner"). According to the contract between Defendant and Wayne

County, Defendant was required to maintain all case files in a locked space in a

designated office area. (ECF No. 15-5, PageID.328) ("The Subcontractor must

have the capacity to maintain case records in a locked space (i.e., file drawer,

cabinet, etc.), in designated office areas."). Defendant maintains that, according

to the contract, case files could not be taken offsite. *Id*.; *see also* ECF 15-3, p. 73.

Defendant maintains that case file updates would have to be done onsite, and not

remotely. (ECF No. 15-3, pp. 63-64, 73) Indeed, the contract emphasizes the

critical importance of maintaining the security and confidentiality of the juvenile

record files:

> C. Confidentiality and Security of Records The identity
> of, and information on, juveniles served by the
> Subcontractor is confidential. The general public is not
> permitted access to information about services to
> clients, except as specifically provided for by law or
> court order. A client's services case file constitutes a
> confidential record. This includes electronic records and
> collateral information sources (i.e., progress notes,
> observation reports. etc.). Confidentiality protections
> also apply to electronic records. The Subcontractor shall
> adhere to this provision that protects the confidentiality
> of case records.
>
> 1. The Subcontractor will provide the County with on-
> site access to case files and related records without prior
> notice from the County.

2. The Subcontractor shall restrict case record access to authorized staff and the Contractor (United Way for Southeastern Michigan).

3. The Subcontractor must have the capacity to maintain case records in a locked space (i.e., file drawer, cabinet, etc.), in designated office areas.

4. The Subcontractor shall not provide or disclose the contents of a case file to a third party without the approval of the Department.

(ECF No. 15-5, PageID.327-28).  Thus, Defendant maintains that Kellar could not perform an essential function of her job remotely, and as such, she cannot establish the prima facie case for disability discrimination or failure to accommodate and these counts should be dismissed.

Kellar argues that she could have performed the essential functions of her job remotely because the provision only requires that the office area be known to the subcontractor and that the files be locked away.  While it is not clear that Kellar requested that the files be moved to a secondary location as an accommodation, in the court's view, such a request would not be reasonable because it would require Defendant to secure and staff a second location and would require all of Defendant's other employees to travel to a secondary location to perform part of their job.

According to Kellar, notes that needed to be put inside the case files were first created through an app then printed and added to the physical case file.  (ECF

20-22, Plaintiff's Declaration, ¶ 9).  When she asked for an accommodation, Kellar

suggested an intern could print and put the notes in files (ECF No. 20-24, October

21, 2019), but this request was denied.  (ECF No. 20-25, October 21, 2019 from

Mr. Reed).  Thus, Kellar's proposed accommodation was to continue to work

remotely and have interns perform the on-site work.  According to Kellar, this

request would have been reasonable and not displaced any existing employee

from their positions.  However, Ms. Wilson indicated that working remotely only

allowed Kellar to complete "an average of 50% of your work duties- eliminating

the client management responsibilities."  (ECF No. 15-7, PageID.455).  Ms. Wilson

also indicated that additional staff would have to be hired to perform the rest of

Kellar's work.  (ECF No. 15-7, PageID.456).  Kellar does not offer any evidence to

contradict these assertions.

Kellar has not seriously disputed that management of the paper case files

was required to be done onsite, given that her proposed accommodation was to

have interns perform this job function for her.  This does not resolve the question

of whether this was an "essential job function."  Written job descriptions are also

not dispositive.  *Rorrer v. City of Stow*, 743 F.3d 1025, 1039–40 (6th Cir. 2014)

(citing *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("[A]n

employer may not turn every condition of employment which it elects to adopt

into a job function, let alone an essential job function, merely by including it in a

job description.")).  Testimony from the plaintiff's supervisor that a job function is

actually marginal may effectively rebut a written description that states that a job

function is essential.  *Id*. (citing *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1257

(11th Cir. 2007)).  In *Skerski v. Time Warner Cable Co.*, 257 F.3d 273 (3d Cir. 2001),

the Third Circuit reasoned that "conflicting deposition testimonies" concerning a

job's essential functions required reversal of a grant of summary judgment to the

employer.  *Id*. at 283.  "Although the employer's judgment and the written job

descriptions may warrant some deference, [the plaintiff] put forth considerable

evidence that contradicts [the employer's] assertions," creating a "genuine issue

of material fact [concerning] essential function."  *Id*.  Ms. Wilson testified that an

average of 50% of Kellar's job involved client file management responsibilities and

during the time frame at issue, it was more because Defendant was in the midst

of being audited by Wayne County.  (ECF No. 15-3, p. 107).  Thus, its employees

were required to "fine-tooth comb" their files in preparation for on-site audits.

*Id*.  Here, however, Kellar has not put forth any evidence suggesting that the

onsite case management duties are not an essential function and thus has not

created a genuine issue of material fact.

Accordingly, the question is whether having an intern perform her essential job function is a reasonable accommodation.  A "reasonable accommodation" under the ADA does not require employers "to create new jobs [or] displace existing employees from their positions ... in order to accommodate a disabled individual."  *Burns v. Coca–Cola Enters., Inc.*, 222 F.3d 247, 257 (6th Cir. 2000).  As explained in *EEOC v. Ford Motor Company*, a "reasonable accommodation" may include "job restructuring and part-time or modified work schedules" but it does not include removing an "essential function" from the job because that is *per se* unreasonable.  *Id*. at 761 (citing *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir. 1998)).  Because there is no genuine issue of material fact regarding whether the onsite case management duties were essential, Defendant had no duty to provide an accommodation and this claim too, must fail.[3]

E.    Retaliation Claims (Counts I, IV, V)

Defendant moves for summary judgment on Kellar's retaliation claims under the ADA, the PWDCRA, and the WPA.[4]  Retaliation claims brought under

---

[3] Because the court finds that Kellar did not establish a prima facie case, the court need not address Defendant's arguments regarding its legitimate business reasons for its action or pretext.

[4] Kellar points out in her response that Defendant did not move for summary judgment on the WPA claim.  In reply, Defendant explains that it mistakenly left reference to the WPA out of its headings in sections B and E of its initial brief, but intended those arguments to apply to Kellar's WPA claims as well.  Given that the legal standards are essentially the same and Kellar

these statutes are analyzed under the same standard as Title VII retaliation

claims.  *Shefferly v. Health All. Plan of Michigan*, 94 F. App'x 275, 284 (6th Cir.

2004) (The standards for evaluating retaliation claims under Title VII, the ELCRA,

the ADA, and the PWDRCA are identical); *see also Woods v. Washtenaw Hills*

*Manor Inc.*, 2009 WL 728537, at *13 (E.D. Mich. Mar. 19, 2009) (Standards for

Michigan WPA retaliation claim similar to Title VII and ECLRA: "To state a claim for

retaliation under the WPA, the plaintiff must show that (1) the plaintiff was

engaged in a protected activity under the Act; (2) the plaintiff was discharged or

discriminated against; and (3) a causal connection exists between the protected

activity and the discharge.") (citing *Chandler v. Dowell Schulumberger*, Inc., 456

Mich. 395, 399 (1998)).  To establish a *prima facie* case of retaliation, a plaintiff

must establish that: (1) she engaged in a protected activity; (2) her "exercise of

such protected activity was known by the defendant; (3) thereafter, the

defendant took an action that was 'materially adverse' to the plaintiff; and (4) a

causal connection existed between the protected activity and the materially

adverse action."  *Rogers v. Henry Ford Health Sys.*, 2018 WL 3629057, at *8 (6th

---

had an opportunity to response to these arguments, the court will consider Defendant's
arguments regarding the WPA claim.

Cir. July 31, 2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014)).

According to Defendant, Kellar has identified two materially adverse actions – the reduction in her hours while she was working remotely and her "termination."  Defendant argues that Kellar cannot establish a causal connection between her complaints and the materially adverse actions.  As to the reduction in her hours, Defendant again argues that the reduction was based on Kellar's inability to perform essential onsite job duties, as discussed above.  Kellar again disputes the requirement that case files must be kept onsite, pointing to her testimony that the files were kept in a temporary location at a church.  However, Kellar's testimony is less than clear on this point.  She testified that Defendant was going to set up a satellite location at St. Mark's Church and was "supposedly going to transfer some of the files to that location so that they could be accessible."  (ECF No. 15-2, p. 81).  She does not know, however, if any files were ever transferred there.  *Id*. at p. 82.[5]  Fundamentally, Kellar's complaints about

---

[5] Kellar does not seem to suggest that Defendant should have moved all its files to another location as an accommodation nor does she offer any evidence suggesting that such an accommodation would be reasonable.  Again, on its face, it is unreasonable to expect all other employees to perform a significant part of their duties at a different location to accommodate Kellar's inability to work at Defendant's primary location.

the building did cause her hours to be reduced. But that reduction was an accommodation, not retaliatory conduct.

As to her termination, Defendant makes two arguments. First that her complaints about the building and request for accommodation occurred over a year before her "termination" and thus, she cannot show causation. Second, the decision to reduce the budget for fiscal year 2020-21 was made before Kellar filed her September 30, 2020 DOL complaint and thus, the materially adverse action was not causally connected to her "termination." In response, Kellar points out that she made other complaints before the decision was made and timing is sufficient to establish causation.

Assuming that Kellar can establish a prima facie case of retaliation as to her "termination," Defendant has offered a legitimate business reason for its decision and Kellar cannot show this reason was pretextual. Under *McDonnell Douglas*,[6] (1) a plaintiff must establish a prima facie case of discrimination; then (2) the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff; and (3) if the defendant does so, the burden of production shifts back to the plaintiff to show

---

[6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

that the defendant's articulated reason was pretext for the adverse employment

action.  *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (citing

*Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019)).  A plaintiff

can establish pretext by showing that the proffered reason: "(1) ha[d] no basis in

fact; (2) did not actually motivate the [adverse employment] action; or (3) [was]

insufficient to warrant the [adverse employment] action."  *Hostettler v. Coll. of

Wooster*, 895 F.3d 844, 858 (6th Cir. 2018) (quoting *Demyanovich v. Cadon Plating

& Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014)).  Ultimately the plaintiff must

produce "sufficient evidence from which a jury could reasonably reject [the

employer's] explanation of why it fired [or failed to rehire] her."  *Chen v. Dow

Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).  She must meet this evidentiary

burden by a preponderance of the evidence.  *Redlin v. Grosse Pointe Pub. Sch.

Sys.*, 921 F.3d 599, 607 (6th Cir. 2019).

As described in detail above, due to a steep decline in revenues resulting

from the pandemic, Defendant decided to eliminate the full-time case manager

role in the Diversion program and revert it to a part-time independent contractor

position like the rest of the staff in the Diversion program, which resulted in its

offer to Kellar for a part-time contract position or a severance package.  (ECF No.

15-3, p. 28; ECF No. 15-4, p. 106).  Such budgetary concerns stemming from the

COVID-19 pandemic provide a legitimate business reason for Defendant's action. *See e.g.*, *Lu v. Univ. of Dayton*, 651 F. Supp. 3d 900, 914 (S.D. Ohio 2023), aff'd, 2023 WL 8187299 (6th Cir. Nov. 27, 2023) (Defendant's proffered reason for not hiring adjunct professors for the Fall 2020 semester – because of the COVID-19 pandemic and ensuing budget uncertainty – provided a legitimate and non-discriminatory reason for its decision.).

Kellar maintains that the proffered reasons are pretextual because Defendant applied for, and received, a Paycheck Protection Program loan in April of 2020 in the amount of $129,600.  (ECF No. 20-38, PPP Loan 2020).  According to the loan documents, Defendant received its first payment in May 2020 and would continue to receive monthly payments for 24 months.  *Id*.  Defendant signed the PPP Loan Application, which states in part:

> The Borrower did not reduce salaries or hourly wages by more than 25 percent for any employee during the Covered Period or Alternative Payroll Covered Period compared to the period between January 1, 2020 and March 31, 2020.  For purposes of this certification, the term "employee" includes only those employees that did not receive, during any single period during 2019, wages or salary at an annualized rate of pay in an amount more than $100,000.

*Id*.  According to Kellar, Defendant kept her employed until after the Covered Period because letting her go before the end of the Covered Period meant not

getting the full loan amount.  Kellar argues that Defendant could not fire her and receive the full loan amount, and thus, a reasonable jury could conclude that the eventual termination reason was in fact pretextual.  However, the language from the loan documents on which Kellar relies does not indicate that Defendant must maintain during the Covered Period the employment of all personnel who were employed during the period of January 1, 2020 to March 1, 2020.  Instead, it says that Defendant cannot reduce the salaries or wages of those employees by more than 25%.  (ECF No. 20-38).  Accordingly, the inference that Kellar asks the court to draw – that Defendant waited until after the expiration of the Covered Period to fire her so that it would receive the full loan amount – is not supported by the loan documents.  Thus, Kellar's pretext argument on this basis fails.

Kellar also argues that despite its claim that it made its decision based on a decrease in funding, five months before giving Kellar the option of working less hours and receiving less pay, it hired Karonna Funderburg as a full-time case manager on May 11, 2020.  (ECF No. 20-45, Diversion Staff Offer Letter).  Further, after Kellar's departure, Defendant hired Dr. Duly, for a case management role. (ECF No. 15-3, p. 178:1-3).  Thus, Kellar argues that the proffered budgetary reason is pretextual because there were sufficient funds available before and

after Kellar's departure to hire case managers but not enough money to keep her as a full-time employee.

In response, Defendant argues that Kellar fails to show how the PPP loan impacted the declining revenue under the Wayne County Diversion Contract, especially since the revenue declined so much that Defendant later voluntarily terminated the contract.  (ECF No. 15-3, p. 181).  Defendant also points out that Funderburg's position was initially funded by both the Diversion Contract and the Workforce Development contract (ECF No. 20-45, PageID.922) and as of October 5, 2020, Funderburg's position was no longer funded by the Diversion contract and was fully funded by the Workforce Development contract.  (ECF No. 22-1).  As to Dr. Duly, Defendant points out that it always maintained that it could fund a part-time independent contractor, which was offered to Kellar, but she declined. (ECF No. 15-3, p. 179) (Dr. Duly hired as independent contractor in case management role).

Ultimately, the evidence supports Defendant's stated non-retaliatory reason for offering Kellar either a part-time contractor position or a severance package.  Kellar does not explain how a $129,000 PPP loan addressed the ongoing budgetary concerns relating to the Diversion contract or how this small loan would or should be used to fund Kellar's position on an ongoing basis, given that

she was paid $43,000 per year plus the cost of benefits and because the loan

supported multiple positions, not just Kellar's.  (ECF No. 15-10; ECF No. 15-3, p.

32:24-25) (Ms. Wilson testified that the PPP loan was not for a specific

department).  For the reasons stated by Defendant, the hiring of Funderburg and

Duly also do not suggest that the reasons stated for Defendant's actions regarding

Kellar were pretextual.  Before Defendant made its offer to Kellar, Funderburg's

position was fully funded by a different contract.  And Duly was placed in a part-

time contractual position similar to that offered to Kellar, which does not support

her theory that there was more funding available for her position and

Defendant's stated reason for its action was pretextual.  Accordingly, Kellar has

not satisfied her burden of providing sufficient evidence from which a jury could

reasonably conclude that the reason stated for Defendant's actions was

pretextual.  Thus, Defendant is entitled to summary judgment on Kellar's ADA,

WPA[7] and PWDCRA retaliation claims.

---

[7] When considering claims under the WPA, Michigan courts apply the same burden-shifting analysis used in retaliatory discharge claims under the ELCRA.  *Taylor v. Mod. Eng'g, Inc*., 252 Mich. App. 655, 659 (2002) (citing *Roulston v. Tendercare (Michigan), Inc*., 239 Mich. App. 270, 280–281 (2000)).  If the plaintiff successfully proves a prima facie case under the WPA, the burden shifts to the defendant to articulate a legitimate business reason for the plaintiff's discharge.  *Id*.  If the defendant produces evidence establishing the existence of a legitimate reason for the discharge, the plaintiff then must show that the legitimate reason offered by the defendant was not the true reason but was only a pretext for the discharge.  *Id*.

F.     Wrongful Discharge Claim (Count XIV)

Defendant argues that Kellar's public policy wrongful discharge claim must

fail because the Michigan Supreme Court holds that a common-law public policy

claim is actionable only where there is no applicable statutory prohibition against

discharge in retaliation for the conduct at issue. *Dudewicz v. Norris-Schmid, Inc.*,

443 Mich. 68, 80 (1993).  And here, because several state statutes govern Kellar's

claims, Defendant argues that her public policy claim must be dismissed.

Kellar does not respond to Defendant's motion for summary judgment on

this claim.  Accordingly, she has abandoned this claim.  *See Doe v. Bredesen*, 507

F.3d 998, 1007-08 (6th Cir. 2007) (stating that the district court "correctly noted …

that [plaintiff] abandoned [certain] claims by failing to raise them in his brief

opposing the government's motion to dismiss the complaint*"); PNC Bank, Nat'l

Ass'n v. Goyette Mech. Co*., 88 F. Supp. 3d 775, 785 (E.D. Mich. 2015) ("A plaintiff

abandons undefended claims."); *Mekani v. Homecomings Fin., LLC*, 752 F. Supp.

2d 785, 797 (E.D. Mich. 2010) (stating that where a plaintiff fails to respond to an

argument in a motion to dismiss, "the Court assumes he concedes this point and

abandons the claim").  Count XIV is, therefore, dismissed.

IV.     **CONCLUSION**

For the reasons set forth above, the court **GRANTS** Defendant's motion for

summary judgment.

**SO ORDERED**.

Date: February 23, 2024                          s/F. Kay Behm
                                                 F. Kay Behm
                                                 United States District Judge